1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

10  JOSE GUTIERREZ and IRMA
    GUTIERREZ,

11                                      NO. CIV. S-10-1142 LKK/EFB

           Plaintiffs,

12
         v.

13
    CITY OF WOODLAND, COUNTY OF

14  YOLO, SERGEANT DALE JOHNSON,
    DEPUTY HERMAN OVIEDO, DEPUTY          O R D E R

15  HECTOR BAUTISTA, individually,
    and in their official capacities,

16
           Defendants.

17  _____/

18       This is a civil rights case brought by the parents of the

19  decedent, Luis Gutierrez Navarro ("Gutierrez").  Gutierrez fled

20  after undercover officers of the Yolo County Sheriff's Department

21  approached him on the street with the stated intention of speaking

22  with him.  After the officers caught up to Gutierrez, there ensued

23  an altercation, which ended when the officers shot and killed

24  Gutierrez.  The First Amended Complaint alleges: a Section 1983

25  claim against the police and the municipality, for the police's

26  unreasonable use of force in violation of the Fourth and Fourteenth

1

Amendments; and state claims for wrongful death, negligence, negligent hiring and training, and intentional infliction of emotional distress.[1]   Plaintiff seeks a summary adjudication of issues, and defendant cross-moves for partial summary judgment, as more specifically described below.

I.   **INTRODUCTION**

   A.   **Facts Relevant to Plaintiffs' Motion for Summary Adjudication.**

   On April 30, 2009, three officers of the Yolo County Sheriff's Office were working together as part of their duties with the Yolo County Gang Task Force.[2]   The officers were: (1) Sergeant Dale Johnson,[3] the person in charge of the Yolo County Gang Task Force; (2) Detective Hernan Oviedo, who was assigned to the Gang Task Force; and (3) Deputy Hector Bautista, who was also assigned to the Gang Task Force.[4]   The three, working undercover, rode in an unmarked car in the "Gum Avenue overpass" area in Woodland, California.[5]   Bautista drove.[6]   All three were wearing street

---

   [1] Defendant City of Woodland was dismissed from the case by stipulation on January 13, 2012.   Dkt. No. 39.

   [2] Because defendants are the non-moving party, the facts are described in the light most favorable to them, where there is evidence to support the description.

   [3] Currently a Lieutenant.   Johnson Decl. ¶ 3.

   [4] Johnson Decl. (Dkt. No. 44)   ¶¶ 6-8.

   [5] Johnson Decl. at p.2.

   [6] See Johnson Decl. ¶ 15.

1   clothes.[7]  All three carried guns.[8]

2        As the three officers rode in the car, they observed
3   Gutierrez, whom they observed to be "a Hispanic male," walking down
4   the street.[9]  The officers do not claim that they observed any
5   suspicious or illegal activity by Gutierrez.  None of the officers
6   knew Gutierrez, had encountered him before, or knew anything about
7   him.  However, the officers did notice Gutierrez's appearance.
8   Gutierrez wore a "long baggy shirt, baggy 'Dickies' style pants,"
9   and he had a "shaved head."[10]  From their training on the Gang Task
10  Force, the officers associated such clothing with gang activity.
11  Johnson Decl. ¶ 14.  Also, the area where Gutierrez was walking was
12  an area known to them to be a location of gang activity – shootings
13  and gang-related grafitti.  Bautista Decl. (Dkt. No. 45) ¶ 6;
14  Johnson Decl. ¶ 11.

15       The officers decided that they would "attempt to talk with
16  this man."[11]  Johnson left the car and approached Gutierrez.
17  Johnson tucked in his shirt so as to display his belt, which
18  contained his police badge and his gun.[12]  Gutierrez looked down at
19  ////

20  _____

21       [7] Johnson Decl. ¶ 9; Oviedo Dep. (Dkt. No. 41-1) at pp. 47 &
    57.

22       [8] Johnson Decl. ¶ 16; Oviedo Dep. p. 114

23       [9] Johnson Decl. ¶ 12.

24       [10] Johnson Decl. ¶ 14.

25       [11] Johnson Decl. ¶ 13.

26       [12] Johnson Dec. ¶ 16.

1  the belt and then back up at Johnson.[13]   Johnson then said to

2  Gutierrez: "Sheriff's Department, may I speak with you?"[14]

3        Gutierrez then put his hand in his pocket, turned, and fled on

4  foot directly into traffic.[15]   Johnson drew his weapon and, with

5  Oviedo following behind, gave chase on foot.[16]   As Johnson closed

6  the distance between himself and Gutierrez, he holstered his gun.[17]

7  As Johnson caught up to Gutierrez, he made fleeting contact with

8  Gutierrez's upper torso, in an attempt to stop him.[18]   Gutierrez

9  ducked out of the contact however, and Johnson passed by him.[19]

10       Gutierrez came to a stop at this point, with Johnson in front

11  of him, and Oviedo behind.[20]   Immediately, Gutierrez pulled out a

12  knife, leaned toward Johnson and made a "slashing motion" at him,

13  causing Johnson to jump back.[21]   At that point, Johnson and Oviedo

14  drew their weapons, and shot and killed Gutierrez.[22]

15  ////

16  

17       [13] Johnson Decl. ¶ 17.

18       [14] Johnson Decl. ¶ 15.

19       [15] Johnson Decl. ¶¶ 17 & 18.

20       [16] Johnson Decl. ¶¶ 22 & 23.

21       [17] Johnson Decl. ¶ 24.

22       [18] Johnson Decl. ¶ 25.

23       [19] Johnson Decl. ¶¶ 25 & 26.

24       [20] Johnson Decl. ¶ 27.

25       [21] Johnson Decl. ¶¶ 28-30.

26       [22] Johnson Decl. ¶ 30.

**B.   Facts Relevant to Defendants' Cross-Motions**

The Yolo County Sheriff's Department has a written "Use of Force" policy.[23]  After the shooting, the Department conducted an investigation, and concluded that no laws or policies were violated.[24]

## II.   THE CROSS MOTIONS

**A.   Plaintiffs' Motion for Summary Adjudication of Issues.**

Plaintiffs move for summary adjudication of two issues.[25]

First, plaintiffs seek a summary adjudication that Gutierrez was "seized" within the meaning of the Fourth Amendment, "prior to shooting him because they intentionally applied physical force to his person that made him stop and stand his ground."

Second, plaintiffs seek a summary adjudication that the seizure was unreasonable, within the meaning of the Fourth Amendment, because the police "initiated the seizure without any articulable, reasonable suspicion of criminal activity."

---

[23]  Lopez Decl. (Dkt. No. 50) ¶ 3.

[24]  Lopez Decl. (Dkt. No. 5) ¶¶ 6-8.

[25]  The Federal Rules of Civil Procedure provide for requests for summary adjudication of issues.  Rule 56(a) reads: "A party may move for summary judgment, identifying each claim or defense – or the <u>part</u> of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a) (emphasis added).  According to Moore's Federal Practice 3d, "This language was added to the rule in 2010 to make clear that summary judgment may be requested not only as to an entire case, or as to a complete claim or defense, but also as to parts of claims or defenses."  Section 56.122[2] at 56-309 (noting that "This was probably always the rule," and that "the freedom to use summary judgment procedure to address particular issues or elements of a claim is an important feature of Rule 56, making it a much more useful case management device").

1          **B.    Defendants' Motion for Partial Summary Judgment.**

2          Defendants request summary judgment on Claims 3 and 5.  Claim

3    3 is for municipal liability under <u>Monell v. Department of Social</u>

4    <u>Servs.</u>, 436 U.S. 658 (1978), for the use of excessive force.  Claim

5    5 is a state claim for negligent hiring, retention, training and

6    supervision.   They argue that plaintiffs have not shown that a

7    municipal policy or practice caused any unconstitutional conduct

8    here.

9    **III. ARGUMENTS**

10         **A.    Plaintiffs' Motion for Summary Adjudication.**

11             **1.    Fourth Amendment "Seizure."**

12         Plaintiffs argue that Gutierrez was "seized" when Sergeant

13   Johnson, while attempting to stop Gutierrez, came into physical

14   contact with Gutierrez's upper torso (grabbed Gutierrez by the

15   shoulders, in plaintiff's view), and the chase ended,[26] citing

16   <u>Brendlin v. California</u>, 551 U.S. 249, 254 (2007).  Once the chase

17   ended, Sergeant Johnson was in front of Gutierrez and Sergeant

18   Olviedo was behind, restraining and curtailing Gutierrez's

19   movement.   Plaintiffs assert that at this point, the police had

20   effected a "seizure" of Gutierrez.  That is because the police had

21   "grabbed" him, he was no longer running, and no reasonable person

22   ———————————

23         [26] Plaintiffs do <u>not</u> assert that Gutierrez was seized when
     Johnson first asked to speak with him.  That appears to be
24   foreclosed by Ninth Circuit law, in any event.  <u>See</u> <u>U.S. v. Smith</u>,
     633 F.3d 889, 892-93 (9th Cir.), <u>cert. denied</u>, 564 U.S. ____, 131
25   S. Ct. 3005 (2011).  Plaintiffs also do <u>not</u> assert that Gutierrez
     was "seized" when the police chased him down, guns blazing,
26   shouting whatever they said.  That appears to be foreclosed by
     <u>California v. Hodari D.</u>, 499 U.S. 621, 629 (1991).

1  in his situation would have thought that he was "free to leave."

2  See I.N.S. v. Delgado, 466 U.S. 210, 215 (1984).[27]

3      Defendants argue that Gutierrez was not seized until he was

4  shot.    They  concede  that  he  "came  to  a  stop  facing  Sergeant

5  Johnson."   Dkt. No. 48 at 2 (Defendants' Cross-Motion for Summary

6  Judgment  on  Monell  issues).    Their  view  is  that  even  though

7  Gutierrez briefly stopped, he only did so in order to withdraw his

8  knife and try to fight his way out of the confrontation.    Under

9  those  circumstances,  they  argue,  there  was  no  yielding  or

10  submission in any realistic sense, and he was still trying to evade

11  the police.    See U.S. v. Smith, 633 F.3d 889, 893 (9th Cir.) (no

12  seizure where defendant "did not submit in any realistic sense"),

13  cert. denied, 564 U.S. ___, 131 S. Ct. 3005 (2011).   The police do

14  not  dispute  that  shooting  Gutierrez  dead  was  a  seizure  under

15  Tennessee v. Garner, 471 U.S. 1, 7 (1985) ("there can be no

16  question that apprehension by the use of deadly force is a seizure

17  subject   to   the   reasonableness   requirement   of   the   Fourth

18  Amendment").

19          **2.   "Reasonableness" of the (Attempted) Seizure**

20      Plaintiffs argue that the police lacked reasonable suspicion

21  that  Gutierrez  was  engaged  in  criminal  activity,  and  that

22  therefore,  they  seized  Gutierrez  –  by  grabbing  him  around  the

23  shoulders during his flight – in violation of his Fourth Amendment

24  rights.

25  _____

26      [27] Adopting the "free to leave" standard enunciated in U.S. v.
     Mendenhall, 446 U.S. 544, 554 (1980) (Opinion of Justice Stewart).

1     Defendants argue that Gutierrez's presence in a high crime
2  area, his gang-associated clothing, his "headlong flight," and his
3  reaching into his pocket while he fled provided them with the
4  reasonable suspicion they needed to seize him, citing Illinois v.
5  Wardlow, 528 U.S. 119 (2000).  Accordingly, both sides focus their
6  arguments on whether the police had reasonable suspicion that
7  criminal activity was afoot at the time of the attempted seizure.[28]

8     Plaintiffs urge the court to find that defendants' reasons for
9  the seizure were insufficient as a matter of law.  Defendants argue
10 that they had sufficient cause to attempt to seize Gutierrez:
11 (1) he was in an area associated with criminal street gangs; (2) he
12 wore a "long baggy shirt, baggy 'Dickies' style pants and a shaved
13 head," which was consistent with gang wear; (3) he engaged in
14 "headlong flight" into two lanes of traffic to evade the police;
15 and (4) he put his hand in his pocket when he turned to run,
16 possibly reaching for a weapon or contraband.

17 _____

18     [28]  The Fourth Amendment "applies to all seizures
         of the person, including seizures that involve
19       only a brief detention short of traditional
         arrest." United States v. Brignoni-Ponce, 422
20       U.S. 873, 878 (1975). Accordingly, the Fourth
         Amendment requires that such seizures be, at
21       a minimum, "reasonable." Id.  In order to
         satisfy the Fourth Amendment's strictures, an
22       investigatory stop by the police may be made
         only if the officer in question has "a
23       reasonable suspicion supported by articulable
         facts that criminal activity may be afoot...."
24       U.S. v. Sokolow, 490 U.S. 1, 7 (1989)
         (internal quotation omitted) (citing Terry v.
25       Ohio, 392 U.S. 1, 30 (1968)).

26 U.S. v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000).

1    Plaintiffs argue that Johnson lacked a basis to seize
2  Gutierrez: (1) he relied on generalized "war stories," not specific
3  data, to conclude that they were in a "high crime area;"
4  (2) Gutierrez's clothing did not indicate gang membership, and in
5  any event, gang membership alone is no reason to seize, and not a
6  proxy for criminal activity; (3) Gutierrez's flight was not
7  "unprovoked" and thus provides no reasonable suspicion to seize;
8  and (4) Gutierrez's hand on or in his pocket does not create
9  reasonable suspicion, since possibly he was trying to keep things
10  from falling out.    In any event, the "totality of the
11  circumstances" does not support the seizure.

12         **3.  Capacity To Sue**

13    Defendants argue that plaintiffs do not have the capacity to
14  sue under State law, citing Cal. Civ. Code § 377.32, and
15  plaintiffs' failure to file the affidavit required by state law.

16  **B.  Defendants' Motion For Partial Summary Judgment -**
17  **Municipal Liability.**

18    The First Amended Complaint alleges that defendant Yolo County
19  Sheriff's Department has an unconstitutional policy, practice and
20  custom that lead to Gutierrez's death.    Defendants argue that
21  plaintiffs cannot show, as pertinent here, that the Sheriff's
22  Department ratified the conduct of the police officers.[29]

23    Plaintiffs argue that ratification can be established – even

24  _____

25       [29] Defendant also argues that there is a complete failure of
proof because plaintiffs have cited only this one isolated
26  incident, and that there is no evidence of failure to train.
Plaintiffs' opposition addresses only the "ratification" issue.

in a single-incident case – by showing that the municipal decision-maker reviewed and approved an inadequate investigation of the incident that exonerated the alleged wrong-doer, citing <u>Fuller v. City of Oakland</u>, 47 F.3d 1522 (9th Cir. 1995), and that they have sufficient evidence of this to create a genuine issue of fact.

**IV.  SUMMARY JUDGMENT STANDARDS**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>Ricci v. DeStefano</u>, 557 U.S. 557, _____, 129 S. Ct. 2658, 2677 (2009) (it is the movant's burden "to demonstrate that there is 'no genuine issue as to any material fact' and that they are 'entitled to judgment as a matter of law'"); <u>Walls v. Central Contra Costa Transit Authority</u>, 653 F.3d 963, 966 (9th Cir. 2011)(per curiam) (same).

Consequently, "[s]ummary judgment must be denied" if the court "determines that a 'genuine dispute as to [a] material fact' precludes immediate entry of judgment as a matter of law."  <u>Ortiz v. Jordan</u>, 562 U.S. ___, 131 S. Ct. 884, 891 (2011), <u>quoting</u> Fed. R. Civ. P. 56(a); <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (en banc) (same), <u>cert. denied</u>, 565 U.S. _____, 132 S. Ct. 1566 (2012).

Under summary judgment practice, the moving party bears the initial responsibility of informing the district court of the basis for its motion, and "citing to particular parts of the materials in the record," Fed. R. Civ. P. 56(c)(1)(A), that show "that a fact

10

1  cannot be ... disputed."  Fed. R. Civ. P. 56(c)(1); <u>In re Oracle</u>

2  <u>Corp. Securities Litigation</u>, 627 F.3d 376, 387 (9th Cir. 2010)

3  ("The moving party initially bears the burden of proving the

4  absence of a genuine issue of material fact"), <u>citing</u> <u>Celotex v.</u>

5  <u>Catrett</u>, 477 U.S. 317, 323 (1986).

6      If the moving party meets its initial responsibility, the

7  burden then shifts to the non-moving party to establish the

8  existence of a genuine issue of material fact.  <u>Matsushita Elec.</u>

9  <u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-86 (1986);

10 <u>Oracle Corp.</u>, 627 F.3d at 387 (where the moving party meets its

11 burden, "the burden then shifts to the non-moving party to

12 designate specific facts demonstrating the existence of genuine

13 issues for trial").  In doing so, the non-moving party may not rely

14 upon the denials of its pleadings, but must tender evidence of

15 specific facts in the form of affidavits and/or other admissible

16 materials in support of its contention that the dispute exists.

17 Fed. R. Civ. P. 56(c)(1)(A).

18     "In evaluating the evidence to determine whether there is a

19 genuine issue of fact," the court draws "all reasonable inferences

20 supported by the evidence in favor of the non-moving party."

21 <u>Walls</u>, 653 F.3d at 966.  Because the court only considers

22 inferences "supported by the evidence," it is the non-moving

23 party's obligation to produce a factual predicate as a basis for

24 such inferences.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 810 F.2d

25 898, 902 (9th Cir. 1987).  The opposing party "must do more than

26 simply show that there is some metaphysical doubt as to the

1 material facts ....  Where the record taken as a whole could not

2 lead a rational trier of fact to find for the nonmoving party,

3 there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at

4 586-87 (citations omitted).

5 **V.   ANALYSIS - PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION**

6       **A.   Plaintiffs' Capacity To Sue.**[30]

7       Plaintiffs' First Cause of Action, under 42 U.S.C. § 1983,

8 alleges that defendants violated the decedent Gutierrez's own

9 constitutional rights.  Accordingly, this claim is a survivor

10 action, an exception to the "general rule" that permits only the

11 person whose rights were allegedly violated to sue:

12       In § 1983 actions, however, the survivors of an
      individual killed as a result of an officer's excessive

13       use of force may assert a Fourth Amendment claim on that
      individual's behalf if the relevant state's law

14       authorizes a survival action.

15 <u>Moreland v. Las Vegas Metropolitan Police Dept.</u>, 159 F.3d 365, 369

16 (9th Cir. 1998).  California law does authorize survivor actions

17 under its survival statute, Cal. Civ. Proc. § 377.30.  That statute

18 provides that "[a] cause of action that survives the death of the

19 person entitled to commence an action or proceeding passes to the

20 decedent's successor in interest ... and an action may be commenced

21 by the decedent's personal representative or, if none, by the

22 decedent's successor in interest."  <u>Id.</u>; <u>Grant v. McAuliffe</u>, 41

23 Cal.2d 859 (1953); <u>Duenez v. City of Manteca</u>, 2011 WL 5118912 at *6

24 ───────────

25     [30] Defendants included their "capacity" argument in their
opposition to plaintiffs' motion for partial summary adjudication

26 (rather than in their own separate motion for summary judgment),
and so the court addresses it here.

(E.D. Cal. 2011) (Karlton, J.).

There are restrictions on the survivor's ability to sue:

> The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action.

Moreland, 159 F.3d at 369.  California's survival action requires that plaintiffs file an affidavit setting forth the facts enumerated at Cal. Civ. P. § 377.32.  It appears to be undisputed that plaintiffs have not filed such an affidavit, although they have since moved separately for leave to file it.

Defendants assert that Section 377.32 "may be considered a statute of repose," citing Myers v. Philip Morris, Inc., 2003 WL 21756086, 2003 U.S. Dist. LEXIS 13031 (E.D. Cal. 2003) (Coyle, J.), and that its requirements therefore cannot be waived.  They further argue that the statute of limitations for filing a survivor action expired two years after April 30, 2009, and therefore the claim is now "extinguished."

Defendants' "statute of repose" assertion does not lie. Section 377.32 is not a statute of repose, bears no resemblance to a statute of repose, and the district court case defendants cite makes no reference to a statute of repose.[31]  A statute of repose cuts off a claim at a given date, regardless of when the claim accrues or is discovered.  See, e.g., McDonald v. Sun Oil Co., 548 F.3d 774, 779-80 (9th Cir. 2008) ("A statute of repose, however,

---

[31]  To the contrary, Myers held that the Section 377.32 affidavit was not even required in that case.

1  has a more substantive effect because it can bar a suit even before

2  the cause of action could have accrued, or, for that matter,

3  retroactively after the cause of action has accrued. In proper

4  circumstances, it can be said to destroy the right itself. It is

5  not concerned with the plaintiff's diligence; it is concerned with

6  the defendant's peace"), cert. denied, 557 U.S. ___, 129 S. Ct.

7  2825 (2009).

8      Section 377.32 makes no reference to cutting off or

9  extinguishing the claim, contains no cutoff date, no start or end

10  date, and in fact no date of any kind that could identify it as a

11  statute of repose.  Indeed, Section 377.32 does not indicate that

12  it is a condition precedent to filing the lawsuit, see Parsons v.

13  Tickner, 31 Cal. App.4th 1513, 1523-24 (2d Dist. 1995), only that

14  the affidavit must be filed at some point.

15      In any event, the affirmative defense of lack of capacity to

16  sue – which is not jurisdictional, and as shown, is not a statute

17  of repose – may be waived:

18          Even if defendants are correct that ECG lacked
           authorization to sue, this court does not lack subject
19          matter jurisdiction in the sense that it would if
           plaintiffs lacked standing to sue under the "case or
20          controversy" requirement of Article III of the
           Constitution. "The question of a litigant's capacity or
21          right to sue or to be sued generally does not affect the
           subject matter jurisdiction of the district court."
22          Summers v. Interstate Tractor & Equip. Co., 466 F.2d 42,
           50 (9th Cir. 1972).

23

24  De Saracho v. Custom Food Machinery, Inc., 206 F.3d 874, 878 (9th

25  Cir. 2000), cert. denied, 531 U.S. 876 (2000).  Plaintiffs filed

26  their lawsuit on May 7, 2010, and their First Amended Complaint on

14

1    May 27, 2010.   Assuming defendant is correct that a two-year
2    statute of limitations applied to this case, plaintiffs filed their
3    lawsuit well within the limitations period.

4         Defendants filed their answer to the First Amended Complaint
5    on July 22, 2010.   It contained no "specific denial" of plaintiffs'
6    capacity to sue, as required by Fed. R. Civ. P. 9(a). <u>Cooper v.</u>
7    <u>Allustiarte (In Re Allustiarte)</u>, 786 F.2d 910, 914 (9th Cir.), 479
8    U.S. 847 (1986).   On August 24, 2010, defendants, with plaintiffs,
9    filed a joint Status Report.   Defendants discussed their "factual
10   Contentions and Legal Theories," but again said nothing about
11   plaintiffs' alleged lack of capacity to sue.   Instead, defendants
12   waited until they apparently believed the limitations period had
13   expired, in April 2011.   Then, in January 2012, for the first time,
14   they raised the issue of capacity to sue in response to plaintiffs'
15   motion for summary adjudication.   They further assert that it is
16   too late for plaintiffs to remedy the alleged defect because the
17   limitations period has passed.

18        This is a clear case for waiver, even assuming the Section
19   377.32 affidavit was not timely filed.   Defendants were required to
20   assert lack of capacity when they filed their answer, or in some
21   responsive pleading or motion:

22        Even if we were to review the denial of the motion in
          limine directly, we would agree with the district court
23        that defendants waived any objection to plaintiffs
          authorization to sue.   A defendant must challenge a
24        plaintiff's authority to sue by making a "specific
          negative averment."   <u>See</u> Fed. R. Civ. P. 9(a).   Case law
25        in this circuit states that the "specific negative
          averment" must be made "in the responsive pleading or by
26        motion before pleading."   <u>Summers v. Interstate Tractor</u>

1     & Equip. Co., 466 F.2d 42, 49-50 (9th Cir. 1972).

2 De Saracho, 206 F.3d at 878.   Although there is language in the

3 Ninth Circuit that could possibly be read to allow this challenge

4 to be raised on summary judgment,[32] if so, the summary judgment

5 motion must be filed as the responsive pleading ("by motion before

6 pleading"), not 19 months after the responsive pleading (the

7 Answer) was filed.

8     Defendants also try to pile a limitations argument onto their

9 capacity claim, saying that plaintiffs are now barred by the

10 limitations period from filing the required documents.   That also

11 is unavailing.   The statute of limitations was tolled when

12 plaintiffs filed their lawsuit, even if it was defective because of

13 the missing California documents.   See Irwin v. Dept. of Veterans

14 Affairs, 498 U.S. 89, 96 (1990) ("We have allowed equitable tolling

15 in situations where the claimant has actively pursued his judicial

16 remedies by filing a defective pleading during the statutory

17 period").[33]

18

19     [32] In De Saracho, the court found waiver where "Defendants did

20 not raise the authority to sue issue until one week before the
   trial was scheduled to begin. None of defendants made a "specific
   negative averment" in their answers, moved to amend their answers,

21 or filed a motion for summary judgment on this issue. Nor was the
   authority to sue issue among the disputed factual issues listed in

22 the Joint Pretrial Conference Statement filed with the court on
   April 21, 1997."

23

24     [33] Applying tolling where "plaintiff timely filed complaint in
   wrong court," citing Burnett v. New York Central R. Co., 380 U.S.

25 424 (1965); and citing American Pipe & Construction Co. v. Utah,
   414 U.S. 538 (1974) for the proposition that "plaintiff's timely
   filing of a defective class action tolled the limitations period

26 as to the individual claims of purported class members."

1    In any event, plaintiffs have now filed a motion permitting
2    them to file the required California document (Dkt. No. 56).  Since
3    it is timely for them to do so, given the tolling of the
4    limitations period, that separate motion will be granted.

5    **B.   Fourth Amendment "Seizure."**

6         **1.   When Was Gutierrez Seized?**

7         To be clear, plaintiffs do not seek summary adjudication
8    regarding the officers' initial attempt to stop or speak with
9    Gutierrez.[34]   They also do not seek summary adjudication on the
10   reasonableness of the shooting itself.

11        In order to obtain summary adjudication on the Fourth
12   Amendment issue, plaintiffs must establish beyond genuine dispute
13   that: (1) Gutierrez was "seized" when Officer Johnson made contact
14   with his shoulders or upper body, and Gutierrez stopped running;
15   and (2) that there was no "reasonable suspicion" of criminal
16   activity to support the seizure.   Plaintiffs cannot succeed on
17   either score on summary adjudication.   Both issues are for the
18   jury.

19        To meet their burden, plaintiffs assert that Gutierrez was
20   seized when Johnson grabbed him by the shoulders, and that this
21   caused Gutierrez to stop.   Indeed, it is undisputed that at some
22   point during the chase, Johnson reached out for Gutierrez and
23   managed to come into contact with some part of Gutierrez's upper

24
          [34] Defendants describe the initial encounter with Gutierrez as
25   "consensual" and therefore not implicating the Fourth Amendment in
     any way.  At best, however, it can only be described as an
26   attempted consensual event.

17

1  body.  It is also undisputed that immediately after that contact,
2  Gutierrez stopped running.  At that point, Gutierrez was stationary
3  and surrounded by two police officers.

4      Plaintiffs say that these undisputed facts are sufficient to
5  establish that Gutierrez was "seized" at that point.  However,
6  defendants have provided evidence that although Gutierrez stopped
7  running, he immediately pulled out a knife, and starting slashing
8  at the officers.  Therefore, rather than being "seized," Gutierrez
9  simply stopped briefly so that he could fight his way out.  In
10 other words, Gutierrez never stopped fleeing until he was shot.
11 Each side has submitted sufficient evidence to support their
12 version of the facts.

13         **2.   Plaintiffs have not shown, beyond genuine dispute,**
14              **that Gutierrez "submitted."**

15     The question here, is whether Gutierrez "submitted" to the
16 show of authority at the point where he stopped running.  Since
17 this is plaintiff's motion for summary adjudication, the court
18 draws all reasonable inferences in favor of the non-moving
19 defendants.  Defendants have submitted evidence – the depositions
20 of Johnson and Oviedo and their Declarations – from which the court
21 can reasonably infer that although Gutierrez stopped after Johnson
22 made "fleeting contact" with him, he did not stop to "submit" to
23 authority.  Rather, he stopped so that he could grab his knife and
24 try to slash his way out of the circumstances.[35]  Reading the

25 ───────────────────────

26     [35] This is a separate issue from whether in plaintiffs'
    version of the facts, it is reasonable that a person walking

18

1  evidence in that light, Gutierrez did not submit in any realistic
2  sense.

3      Neither party offers a case that is directly on point.
4  Plaintiffs' view, apparently, is that any "stop" that followed
5  Johnson's contact with Gutierrez is a "submission" sufficient to
6  create a seizure.  But logically that cannot be so, as that would
7  include a person who stops to hide after being touched, and a
8  fleeing shooter who briefly stops to re-load his gun after being
9  touched.  This case is not materially different, when viewed in the
10  light most favorable to defendants.  Here, Gutierrez was fleeing
11  with his hand in his pocket.  It is a reasonable inference that his
12  hand was on his knife.  After the fleeting contact with Sergeant
13  Johnson, Gutierrez stopped, but only long enough to withdraw the
14  knife from his pocket and start fighting.  It is too much of a
15  stretch to say that a person who flees, then stops so that he can
16  slash his way to freedom with a knife has "submitted" to
17  authority.[36]

18      The court has not been directed to any case that says that
19  when a defendant "stops" – regardless of the circumstances of the
20

_____

21  peaceably down the street, when confronted by two armed men in
   street clothes (but claiming to be police), and chased by them with
22  their guns drawn, would reasonably feel that he needed to fight his
   way out.
23

24      [36] Also, this cannot be what the Supreme Court or Ninth
   Circuit had in mind when they used the words "submit" and
25  "submission."  Their ordinary dictionary definitions refer to a
   person yielding to the authority or control of another.  There is
26  nothing in the act of trying to fight one's way out of a situation
   that looks like "submission."

1  stop – he has necessarily submitted to authority.  The only cases
2  that seem to address the specific meaning of "submission" address
3  a stop that occurs before flight and prior to any touching, so they
4  are not directly on point.  Nevertheless, they hold that a person
5  who merely stops, in response to a police officer's show of
6  authority, and then flees, has not submitted to authority:

7      We decline to adopt a rule whereby momentary hesitation
       and direct eye contact prior to flight constitute
8      submission to a show of authority.  Such a rule would
       encourage suspects to flee after the slightest contact
9      with an officer in order to discard evidence, and yet
       still maintain Fourth Amendment protections.  A seizure
10     does not occur if an officer applies physical force in an
       attempt to detain a suspect but such force is
11     ineffective.  See Hodari, 499 U.S. at 625. [¶]  We hold
       that Hernandez was not seized because he never submitted
12     to authority, nor was he physically subdued.

13  U.S. v. Hernandez, 27 F.3d 1403, 1407 (9th Cir. 1994), cert.
14  denied, 513 U.S. 1171 (1995).  Smith presented a similar situation
15  where the person momentarily engaged with the police, then fled.
16  The Ninth Circuit found that because he did not "yield," there was
17  no seizure.[37]

18      In this case, Gutierrez's stopping just long enough to
19  withdraw his knife so that he could fight his way out of this

20  ─────────────────
21      [37] Defendants have not moved for summary adjudication but
    nevertheless urge the court to find, as a matter of law, that there
22  was no seizure until Gutierrez was shot.  The court will not grant
    summary adjudication for defendants in the absence of a motion for
23  such relief.  However, such a motion would appear to be futile,
    since viewing the evidence in the light most favorable to
24  Gutierrez, he did submit.  The third-party witness, Ms. Navarro,
    says that she saw the events and that Gutierrez never had a knife
25  in his hands.  This evidence, combined with defendants' admission
    that Gutierrez did stop after the fleeting encounter, requires the
26  court to draw the reasonable inference that Gutierrez's stop was
    a submission to authority.

1  predicament – taking the view most favorable to the non-moving

2  defendants – does not satisfy the requirement that he "submit" or

3  "yield" to police authority.  Accordingly, plaintiffs cannot be

4  granted summary adjudication on their assertion that Gutierrez was

5  "seized" at that point.

6      **C.   Reasonableness of the Attempted Seizure.**[38]

7      Since neither side is entitled to summary adjudication on the

8  question of whether Gutierrez was seized before he was shot, there

9  remains the question of whether, if he was seized prior to the

10  shooting, the seizure was reasonable.  This matters because if it

11  was an unreasonable seizure, and if it provoked Gutierrez into

12  pulling his knife, then the officers may be less likely to prevail

13  on their theory that they had to shoot in self-defense.

14      The officers' bases for the pre-shooting attempted seizure

15  are: (1) Gutierrez was walking in a high-crime area; (2) he wore

16  gang-associated clothing and had a shaved head, also associated

17  with gang membership; (3) he launched into "headlong flight,"

18  directly into traffic, and with his hand in his pocket, when the

19  officers tried to talk with him as a "consensual" encounter.

20      **1.   High crime area.**

21      Preliminarily, it is worth nothing that even if Gutierrez was

22

23      [38] This decision refers to Officer Johnson's contact with
Gutierrez's upper body as the "attempted seizure."  This language

24  is for convenience only, and does not reflect any conclusion that
the attempt was successful or not.  Both sides agree that a seizure

25  was attempted, so it makes sense to refer to it in that way, since
the parties are in dispute about whether the attempt lead to an

26  actual "seizure."

1  in a high crime area, his presence there, standing alone, "is <u>not</u>

2  enough to support reasonable, particularized suspicion that the

3  individual in question has committed or is about to commit a

4  crime." <u>U.S. v. Montero-Camargo</u>, 208 F.3d 1122, 1138 (9th Cir.)

5  (en banc), <u>cert. denied</u>, 531 U.S. 889 (2000).[39] At the same time,

6  the officers "'are not required to ignore the relevant

7  characteristics of a location in determining whether the

8  circumstances are sufficiently suspicious to warrant further

9  investigation.'" <u>Montero-Camargo</u>, 208 F.3d at 1138, <u>quoting</u>

10 <u>Illinois v. Wardlow</u>, 528 U.S. at 124.

11      The court will also keep in mind the danger of citing "high

12 crime area" as another way of referring to places where there are

13 high concentrations of poor and minority persons:

14          The citing of an area as "high-crime" requires careful
            examination by the court, because such a description,
15          unless properly limited and factually based, can easily
            serve as a proxy for race or ethnicity.  District courts
16          must carefully examine the testimony of police officers
            in cases such as this, and make a fair and forthright
17          evaluation of the evidence they offer, regardless of the
            consequences.  We must be particularly careful to ensure
18          that a "high crime" area factor is not used with respect
            to entire neighborhoods or communities in which members
19          of minority groups regularly go about their daily
            business, but is limited to specific, circumscribed
20          locations where particular crimes occur with unusual
            regularity.

21
<u>Montero-Camargo</u>, 208 F.3d at 1138; <u>U.S. v. Manzo-Jurado</u>, 457 F.3d
22

23  ─────────────────

         [39] <u>Citing</u> <u>Brown v. Texas</u>, 443 U.S. 47, 52 (1979) (holding that
24  an investigatory stop was not justified when police officers
    detained two men walking away from each other in an alley in an
25  area with a high rate of drug trafficking because "the appellant's
    activity was no different from the activity of other pedestrians
26  in that neighborhood").

1  928, 934-35 (9th Cir. 2006) ("to establish reasonable suspicion, an
2  officer cannot rely solely on generalizations that, if accepted,
3  would cast suspicion on large segments of the lawabiding
4  population").

5       In this case, the court cannot say that defendants' evidence
6  of a "high crime area" fails "as a matter of law."  Plaintiffs
7  assert that the officers recited only "war stories," rather than
8  actual evidence that the area was a high crime area.  But that is
9  not correct.  Officer Johnson testified in his deposition to
10  specifics that lead him to conclude that the part of Gum Avenue
11  where Gutierrez was walking was a high crime area.  He testified
12  that the overpass that Gutierrez used as an escape route "is
13  vandalized repeatedly with Norteno and sureno vandalism."  Johnson
14  Depo. (Dkt. No. 41-2) at p.43 (referring to the deposition page
15  number).[40]  He testified that "The streets that are located on both
16  sides of the freeway on Gum Avenue have been involved with numerous
17  shootings."  Id.  He did not simply rely on a blanket statement
18  that Gutierrez was in a "high crime area" (although the officer did
19  repeat that phrase quite often).

20       In his declaration, Officer Johnson swore that the area "was
21  known to me for high occurrences of gang activity, including
22  numerous gang related shootings."  Johnson Dec. (Dkt. No. 44) ¶ 11
23  (emphasis added).  He further swore that "Gang related graffiti was
24  frequently visible from the overpass area."  Id.  This testimony

25  _____

26       [40] According to Johnson, the "Nortenos" and "surenos" were
    gangs.

1  lays a sufficient evidentiary foundation for a fact-finder to
2  conclude that Johnson had personal knowledge of the gang activity
3  and shootings that he swore to.   Nothing about these statements
4  indicates that they are just "war stories" as opposed to the
5  declarant's personal observations.   In any event, the officer can
6  be questioned about it at trial, and the jury can decide for itself
7  whether to believe that he actually witnessed these things, or is
8  simply repeating "war stories."

9      Officer Bautista gave even more detailed evidence in his
10 declaration that the area was involved in illegal gang activity.
11 His declaration identifies a photograph taken of the area where the
12 officers encountered Gutierrez.   Based upon his own personal
13 experience and training, he says, he identified gang grafitti in
14 the area.   He also swore that the area "was known to me for high
15 occurrences of street gang activity, including numerous street gang
16 related shootings."   Bautista Dec. (Dkt. No. 45) ¶ 6 (emphasis
17 added).

18     The court cannot conclude that there is no genuine dispute
19 about whether Gutierrez was in a high crime area.

20          **2.   Headlong flight.**

21     Viewing the evidence in the light most favorable to non-moving
22 defendants, Officer Johnson approached Gutierrez, who was walking
23 in a high-crime area.   Johnson displayed his badge, and asked
24 Gutierrez if they could speak.   In response, Gutierrez turned and
25 ran, his hand in his pocket.   In this Circuit, these facts are now
26 sufficient to create "reasonable suspicion" that Gutierrez was

1 engaged in criminal activity.   Smith, 633 F.3d at 894.

2       In Smith, a person walking in a high crime area fled after the
3 police told him to stop and to stand by the police car.[41]   The
4 officer then reached for what Smith thought was a gun, at which
5 point Smith turned and ran.   There was no suggestion that Smith
6 seemed to be discarding contraband or reaching for a weapon.   He
7 just ran.   The police then caught Smith, seized him and searched
8 him.   The Ninth Circuit found that Smith's flight itself – combined
9 with the fact that this occurred in a "high crime" area – created
10 the reasonable suspicion that justified the search and seizure:

11          There may be circumstances where a person's flight has a
            perfectly    innocent    and    reasonable    explanation.
12          Nevertheless,   the   circumstances   here   indicate   that
            Smith's flight was sufficient to engender reasonable
13          suspicion.   It   is   undisputed   that   Smith   was   in   a
            high-crime neighborhood during the events in question,
14          that Officer Dominguez clearly identified himself as a
            police officer, and that Smith burst into headlong flight
15          for no other reason than to evade Officer Dominguez.   The
            officer's determination that Smith's sudden flight was
16          suggestive   of   wrongdoing   was   reasonable   under   these
            circumstances.

17

18 Smith, 633 F.3d at 894.

19       The court cannot conclude that there is no genuine dispute
20 about whether Gutierrez's flight could give rise to reasonable
21 suspicion that he was involved in criminal activity.

22 ////

23 _____

24          [41] There was no suggestion in Smith that the police politely
      asked to speak with Smith; they ran their police lights and
25    demanded that he stop.   Smith initially engaged the police, asking
      if they were talking to him.   The police confirmed that they were
26    talking to Smith, and again commanded him to stand in front of the
      police car.

### 3.   Clothing & Shaved Head.

The officers asserted that when they saw Gutierrez walking down the street, he had a shaved head and was wearing clothing associated with gang activity. <u>See e.g.</u>, Johnson Depo. (Dkt. No. 41-2) at ¶ 135.   The officers do not indicate that the clothing alone was sufficient to create reasonable suspicion that Gutierrez was involved in criminal activity.   However, Johnson testified at his deposition that this was one of the factors that caused him to chase Gutierrez and to attempt to seize him, once Gutierrez ran away.   Johnson Depo. at ¶¶ 44-45.   The officers presented testimony showing why they believed the clothing was gang-related. Plaintiffs presented no evidence to contradict it.   At this point, the court cannot say that the clothing was, as a matter of law, irrelevant to the officers' belief that they had reasonable suspicion that Gutierrez was involved in criminal activity.[42]

## VI.   ANALYSIS - DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT.

For their Third Cause of Action, a Section 1983 claim against the municipal defendants, pursuant to <u>Monell</u>, plaintiffs allege, among other things, that the Yolo County Sheriff's Department "has a policy, practice and custom to tolerate and ratify the use of unreasonable and excessive force and cruel and unusual punishment by its police officers, Sheriffs deputies, employees and agents,"

---

[42] As a logical matter, it is not impossible for a person's clothing to identify him as belonging to a specific group.   Police officers can often be identified by their attire, as can professional baseball players, at least when they are at work. Plaintiffs have not rebutted the evidence presented that gang members can similarly be identified by their clothing.

1   and that it was the Department's policy to inadequately hire, train
2   and supervise its employees.   In their cross-motion for summary
3   judgment, defendants seek dismissal of this cause of action.[43]   As
4   relevant to this case, plaintiffs can <u>ultimately</u> prevail – at trial
5   – in one of three ways.

6        Plaintiffs can prevail at trial if they can show that the
7   alleged constitutional violation was done "pursuant to a formal
8   governmental policy or a 'longstanding practice or custom which
9   constitutes the "standard operating procedure" of the local
10  governmental entity.'"   <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1346
11  (9th Cir. 1992) (per curiam), <u>cert. denied</u>, 510 U.S. 932 (1993).[44]
12  Alternatively, plaintiffs can prevail at trial if they can prove
13  that "an official with final policy-making authority ratified a
14  subordinate's unconstitutional decision or action and the basis for
15  it."   <u>Gillette</u>, 979 F.2d at 1346-47.[45]   Finally, plaintiffs can
16  prevail if they can show that "the individual who committed the
17  constitutional tort was an official with 'final policy-making
18  authority' and that the challenged action itself thus constituted
19  an act of official governmental policy." See <u>Gillette</u>, 979 F.2d at

20  ────────────────────

21       [43]  Defendants also seek dismissal of the Fifth Cause of
     Action, for Negligent Hiring, Retention, Training and Supervision.
22       However, their motion papers offer no explanation for why this
     claim should be dismissed (nor any mention of it at all, other than
23       the bare request that it be dismissed).   Accordingly, the motion
     will be denied as to this claim.

24       [44]  <u>Quoting</u> <u>Jett v. Dallas Independent School Dist.</u>, 491 U.S.
25  701, 737 (1989).

26       [45]  <u>Citing</u> <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112,
     123-24 (1988) (plurality).

1346.[46]

Even though plaintiffs will bear the burden of proof at trial on the above issues, on summary judgment, it is defendants as moving parties, who bear the initial burden. They must show "that there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); In re Oracle, 627 F.3d at 387 (moving parties bears the initial "burden of proving the absence of a genuine issue of material fact"). Moving defendants must support their assertion that a fact cannot be genuinely disputed by citing to evidence in the record, Rule 23(c)(1)(A), or by showing that plaintiffs "cannot produce admissible evidence to support the fact." Rule 23(c)(1)(B). Defendants' Statement of Undisputed Facts must enumerate "each of the specific material facts relied upon in support" of their motion. E.D. Cal. R. 260(a).

Defendants have not taken their burden very seriously, and indeed, have utterly failed to meet their burden. Since defendants seek summary judgment on the lack of the policy alleged by plaintiffs, they were required to make an initial showing that there was no such Yolo County Sheriff's Department policy. Yet defendants' Statement of Undisputed Facts makes no reference to the existence or non-existence of the alleged policies. Moreover, the Lopez Declaration, the sole factual basis for defendants' motion,

---

[46] This third possibility would only appear to apply to the failure to train and supervise part of the claim, as plaintiffs do not seem to claim that Johnson or Oviedo had final policy-making authority.

1  makes no reference to the existence or non-existence of the alleged

2  policies.

3      Instead, defendants direct the court only to the most

4  unremarkable of factual assertions, all undisputed by plaintiffs:

5  that after the shooting there was an Internal Affairs

6  investigation; that the investigation was done in conformity with

7  Yolo County Sheriff's Department procedures;[47] and that the

8  investigation found no problems with the shooting.[48]

9      Defendants' only showing is that the Department does have a

10  written Use of Force Policy, a fact not disputed by plaintiffs.

11  See Lopez Dec. (Dkt. No. 50) Exh. A.  But plaintiffs' claim is not

12  based upon any alleged absence of a written policy.  It is based

13  upon, among other things, the alleged "policy, practice and custom"

14  of the Department "to tolerate and ratify the use of unreasonable

15  and excessive force" by its officers.  The identification of a

16  piece of paper setting forth one policy does does not show that

17  plaintiffs will be unable to prove – at trial – the existence of a

18  policy quite different from the one the Department put in writing.

19      Apart from this one document, defendants' motion is based

20  entirely on its unsupported assertion that plaintiffs "cannot offer

21  evidence of an unconstitutional custom or policy."  See Dkt. No. 48

22

23      [47] Plaintiffs point out however, that in their view, the
    investigation was defective even if it followed procedures, because
24  it failed to include key witnesses interviews, and testing of key
    evidence.
25

26      [48] Plaintiffs point out however, that in their view, the IA
    conclusion is wrong.

29

1 at p.5.  They make no <u>showing</u> that plaintiffs will be unable to

2 meet their ultimate burden.[49]

3      Meanwhile, defendants make no showing <u>of any kind</u> regarding

4 the alleged policy of inadequate hiring and training of its

5 officers.  It is never mentioned in the Lopez Declaration, nor in

6 any evidence identified by defendants in their motion.

7      Defendants do address the existence or non-existence of the

8 alleged policies, but only in their briefs.

9     **A.   Isolated Incident**

10      Defendants claim that the crux of plaintiff's <u>Monell</u> claim is

11 that "the single encounter with Luis Guitierrez on April 30, 2009

12 established a <u>policy, practice or custom</u>."  Dkt. No. 48 at p.5.

13 That completely misstates plaintiff's <u>Monell</u> case.  Plaintiffs do

14 not allege that this one incident established a policy or practice,

15 they allege that this incident occurred because the police acted

16 <u>pursuant to</u> the Department's policy or practice.  Defendants'

17 straw-man argument will not prevail on this summary judgment

18 motion.

19     **B.   Inadequate Training**

20      Defendants simply assert in their briefs that plaintiffs

21 "cannot demonstrate" a policy to inadequate train the officers, and

22 that "there is no evidence" of it. But it is <u>defendant's</u> burden to

23 show (not simply assert) that there is no genuine issue here.

24

25     [49] For example, defendants offer no evidence about the

26 existence or non-existence of excessive force complaints made
against the Yolo County Sheriff's Department.

1 Defendants identify no declaration or other evidence of adequate
2 training, or anything else that would show the absence of a genuine
3 issue here.

   **C.   Ratification By Approval of Inadequate Investigation.**

5 Defendants explicitly reverse the burden of proof in arguing
6 against the "ratification" prong of <u>Monell</u> liability.   Here,
7 defendants had a clear opportunity to identify testimony or file a
8 declaration by a Department official establishing that the
9 Department did not ratify the conduct alleged.   Instead, they
10 assert only that <u>plaintiffs</u> can point to no evidence "of a
11 deliberate or conscious choice by anyone holding final policymaking
12 authority to adopt the deputies' precise actions" as policy, even
13 though it is not plaintiffs' burden to do so.   Defendants had a
14 clear opportunity to meet their burden here, because they submitted
15 the declaration of the apparent decision-maker, Lopez.   But Lopez
16 does not address the ratification issue.

   **D.   Plaintiffs' Response to Defendants' Summary Judgment
        Motion.**

19 Plaintiffs quite sensibly responded to defendants' summary
20 judgment motion on the merits.   However, it was improper for
21 defendants to force plaintiffs to expend their time and resources
22 attempting to meet a burden that properly lay on defendants'
23 shoulders.   Defendants have thrown only false obstacles in
24 plaintiffs' path toward trial.   Accordingly, the court will deny
25 defendants' motion solely on the basis that they have failed to
26 meet their burden on summary judgment.   They are free to defend

1  against the claims at trial.

2  **VII.  CONCLUSION**

3       For the foregoing reasons:

4       1.   Plaintiffs' motion (Dkt. No. 56) for leave to file the

5            declaration of Jose Gutierrez and Irma Gutierrez (Dkt.

6            No. 55) is **GRANTED;**

7       2.   Plaintiffs' motion for summary adjudication (Dkt. No.

8            41), is **DENIED;**

9       3.   Defendants' motion for partial summary judgment (Dkt. No.

10           47), is **DENIED.**

11      IT IS SO ORDERED.

12      DATED:  May 8, 2012.

13

14

15                          _____
                            LAWRENCE K. KARLTON
16                          SENIOR JUDGE
                            UNITED STATES DISTRICT COURT
17

18

19

20

21

22

23

24

25

26